## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ISAAC E. HEAVEN,** | ) | |
| **ROGER L. MARTIN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-15-823-R** |
| | ) | |
| **SKINNER TANK COMPANY, an** | ) | |
| **Oklahoma Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Before the Court is Defendant Skinner Tank Company's motion for summary judgment on Plaintiff Roger L. Martin's Complaint for a hostile work environment. Based upon what it contends are the undisputed facts, most of which come directly from Plaintiff's testimony, Defendant asserts that Plaintiff cannot succeed on his claim. The following facts are undisputed.

Plaintiff is a certified welder. Skinner Tank builds above ground steel storage tanks which can contain fertilizer, asphalt, bio diesel and other material. Plaintiff worked for Skinner Tank for a number of different intervals. Dan Jones, a 29-year employee of Skinner Tank, was Plaintiff Roger Martin's supervisor the entire time Plaintiff worked at Skinner Tank. Dan Jones' immediate supervisors were Kent Brooks, Executive Vice President; Larry Skinner, owner/President; Brad Skinner, Vice President and Director of Safety; and Ron Alexander, Field Supervisor. Mar. Martin's fourth stretch of employment with Skinner Tank began in October of 2014. Every time Mr. Martin came

back to work at Skinner Tank, he asked to be on Mr. Jones' crew.   Mr. Martin testified that he "always got along with everybody" at Skinner Tank.

In June of 2015, the crew was building a tank for a fertilizer company in Iowa. Emory Lincoln, an African American male who has worked has worked for Skinner Tank under Dan Jones for nine years was on the crew in Iowa as was Plaintiff Isaac Heaven, Mr. Martin's cousin.   Mr. Heaven had worked for Skinner Tank under Mr. Jones since January of 2015.   Plaintiff Martin testified that he had a good relationship with Dan Jones and respected him up until June 12, 2015.   On June 12, 2015, Martin's assignment was that of "tack man."   When a sheet of metal came up on the crane, the "tack man" lays it in position and tacks it down.   On June 12, 2015, after Plaintiff had been working approximately 30 minutes he looked up and saw "Dan Jones and Isaac Heaven were into it" – physically fighting, but Mr. Martin did not hear ay words exchanged between Jones and Heaven.   Mr. Martin then walked his cousin down off the tank and went back to work. Mr. Jones did not come back to work after lunch.   Mr. Jones testified that he voluntarily quit his employment with Skinner Tank after returning from lunch on June 12, 2015.   He left the worksite and headed for home around 1:00 p.m.   Mr. Martin finished out his day on June 12, 2015, ending around 3:00 p.m.   Mr. Martin talked with Larry Skinner around 3:30 or 4:00 p.m. on June 12, 2015, because he wanted to know "what was going on" and to ask if he still had a job; the answer was "yes."   According to Mr. Martin, Larry Skinner told him that "he was going to send James May out there to run the crew and that "if . . . [Martin] wasn't part of the fight, . . . [he] had nothing to worry about."   Martin

2

acknowledged that Dan Jones was then out of the picture as far as Martin's direct hierarchy in the company was concerned.   Martin testified that he liked working with James May, the replacement supervisor, and had no complaints against him.   Martin and May on June 12, 2015 discussed that May was coming out to finish the Iowa job.   As of the afternoon of June 12, 2015, Martin believed he still had a job at Skinner Tank.

About 7:00 p.m. on June 12, 2015, Mr. Martin listened to a voicemail from Mr. Jones during which Mr. Jones allegedly called Mr. Martin the N-word.   Plaintiff Martin did not call Larry Skinner after listening to the voicemail from Mr. Jones and never gave a copy of it to Larry or Brad Skinner or anyone else at Skinner Tank or let them know that Jones had allegedly called him the N-word.   Mr. Martin just gave a copy of the voicemail to his lawyer.   Plaintiff said he didn't know why he did not reach out to Larry or Brad Skinner and inform them of the situation with Mr. Jones.   In this lawsuit, Mr. Martin claims that he was "fired" by Mr. Jones via the voicemail which was left at 2:49 p.m. in spite of the fact he had talked to the owner of the company (prior to listening to the voicemail) around 4:00 p.m. and was assured he still had a job and that his new supervisor was James May.   Mr. Martin testified that he was fully aware that Mr. May was replacing Mr. Jones after talking to Mr. Skinner.   Mr. Martin did not return to work at Skinner Tank after June 12, 2015 and when asked why he didn't feel comfortable returning to work there after confirming Jones was no longer his supervisor and off the project, he testified that "the voicemail was just unexplainable."   Mr. Martin never informed anyone that he was not coming back to work on Monday, June 15, 2015; he simply did not show up for work.

3

Martin testified that it was only because of the voicemail that he felt "not welcome" and that prior to the voicemail he had "never encountered a situation where he [Mr. Jones] talked to [him] like that."   Mr. Lincoln testified that he had never known Mr. Jones to use terms like "boy" or the N-word.   Mr. Martin testified that he himself called Emory Lincoln "NIGGA."   Mr. Martin also testified that although he talked to "one of the Skinner guys" about his check sometime after June 12, 2015, he did not mention the voicemail or anything about Mr. Jones.

Based on the foregoing undisputed fats, Defendant Skinner Tank argues that Plaintiff's hostile work environment claim fails as a matter of law, first asserting that Plaintiff was not constructively discharged and secondly that Plaintiff was not subjected to a hostile work environment.   With respect to the constructive discharge claim, Defendant asserts that it is undisputed that Plaintiff voluntarily chose to quit his job at Skinner Tank and that there is no evidence that he was forced to quit or threatened with termination by any member of management at Skinner Tank.   To the contrary, Plaintiff was assured by the owner of the company on June 12, 2015, that he still had a job.

A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.   *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004).   The court employs an objective standard to determine "the voluntariness of an employee's resignation.   *Id.*   Plaintiff has the burden of showing that at the time of his resignation; his employer "did not allow him to make a free choice regarding his

employment relationship." *Id.*   Upon review of the undisputed facts herein, no reasonable person in the Plaintiff's position would feel forced to resign and Plaintiff voluntarily chose to quit his employment after receiving a voicemail from his former supervisor who was no longer employed by Skinner Tank.   Even if Plaintiff did not know that Mr. Jones was no longer employed by Skinner Tank when he listened to the voicemail, one voicemail calling him the N-word, while egregious did not render Plaintiff's working conditions at Skinner Tank intolerable.   At a minimum, Plaintiff knew at the time he failed to return to work that Jones would no longer be his supervisor.   No reasonable jury could find that Plaintiff was constructively discharged from his employment.

A fortiori, no reasonable jury could find that Plaintiff was subjected to a hostile work environment.   Plaintiff's hostile work environment claim is predicated on the single voicemail calling him the N-word.   While that was reprehensible, a single incident is generally insufficient to establish a hostile work environment.   A "plaintiff must show 'more than a few isolated incidents of racial enmity.'"   *Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir. 1994)(*quoting Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987)(internal quotation omitted).   Rather, me must show "a steady barrage of opprobrious racial comments." *Id.*, *citing Hicks* at 1412-13.   *See Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)(noting that stray, isolated "comments fall short of the 'steady barrage' required for a hostile environment claim").   To survive summary judgment on a claim alleging a racially hostile work environment, a plaintiff "must show that a rational jury could find that the work place is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and that the victim was targeted for harassment because of his race or national origin. *Herrezal v. Lufkin Industries, Inc.* 474 F.3d 675, 680 (10th Cir. 2007)(*quoting Sandoval v. City of Boulder*, 388 F.3d 1312, 13266-27 (10th Cir. 2004)).   Plaintiff correctly maintains that treatment of other employees or comments not directed at the Plaintiff may be considered in determining whether a hostile work environment existed, *citing Hirase-Doi v. U.S. West Communications*, 61 F.3d 777, 782 (10th Cir. 1995).   However, Plaintiff has not submitted evidence that Plaintiff Martin knew that Dan Jones had repeatedly addressed Plaintiff Heaven as "boy" or that he had been overheard using the N-word as he drove through the hotel parking lot after firing Plaintiff Heaven.   Even if the Court assumes that Plaintiff did not know that Mr. Jones had quit his job at Skinner Tank at the time Plaintiff listened to the voicemail, Plaintiff cannot meet this standard.

Plaintiff argues that Defendant can be liable for the tort of outrage.   The Court does not read Plaintiff's Complaint as stating a claim for intentional infliction of emotional distress, also known as the tort of outrage.   But assuming Plaintiff has stated such a claim, the claim fails as a matter of law because no reasonable jury could find that a single voicemail apparently referring to both Plaintiffs as "dumb ghetto assed niggers" from Plaintiff's former supervisor (Dan Jones had already quit his job at the time he left the voicemail and at the time Plaintiff Martin listened to it) is conduct so extreme and outrageous as to go beyond all possible considered "atrocious and utterly intolerable in a

6

civilized society." *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) <u>or that the conduct in</u> <u>question is attributable to Defendant Skinner Tank,</u> Dan Jones having quit his employment with Defendant prior to leaving the voicemail.   "Not every abusive outburst or offensive verbal encounter may be converted into a tort."   *Id.*   And the outrageous or extreme nature of the conduct at issue must be considered in the milieu in which it takes place.   *Id.*

In accordance with the foregoing, Defendant's motion for summary judgment on Plaintiff's Complaint is GRANTED.

IT IS SO ORDERED this 8th day of March, 2016.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE